## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rita Kohari, John Radolec, and Mohani Jaikaran, individually and as representatives of a class of similarly situated persons, and on behalf of the MetLife 401(k) Plan (f/k/a the Savings and Investment Plan for Employees of Metropolitan Life and Participating Affiliates), | Case No. 21-cv-6146 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| MetLife Group, Inc., Metropolitan Life Insurance Company, the Benefit Plans Investment Advisory Committee, and John and Jane Does 1-20, | |
| Defendants. | |

## NATURE OF THE ACTION

1.     Plaintiffs Rita Kohari, John Radolec, and Mohani Jaikaran, individually and as representatives of the Class described herein, and on behalf of the MetLife 401(k) Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants MetLife Group, Inc. ("MetLife Group"), Metropolitan Life Insurance Company ("Metropolitan Life"), the Benefit Plans Investment Advisory Committee ("Committee"), and John and Jane Does 1-20 (collectively, "Defendants").[1] As described herein, Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries, by applying an imprudent and disloyal preference for MetLife index fund products within the Plan, despite

---

[1] MetLife Group, Metropolitan Life, and their affiliates are collectively referred to herein as "MetLife".

their poor performance, high costs, and lack of traction among fiduciaries of similarly sized plans. Defendants' imprudent and disloyal conduct has cost Plan participants millions of dollars over the statutory period. Plaintiffs bring this action to remedy Defendants' unlawful conduct and to obtain appropriate monetary, equitable, and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of December 2020, Americans had approximately $9.6 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[2] Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations.[3] Only around 11% of non-union U.S. workers in the private sector participate in a defined benefit plan.[4] By contrast, approximately 47% of non-union U.S. workers in the private sector participate in a defined contribution plan.[5]

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). In a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the

---

[2] *See* Investment Company Institute, *Retirement Assets Total $34.9 Trillion in Fourth Quarter 2020* (Mar. 18, 2021), https://www.ici.org/node/836811.
[3] *See* Bankrate, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx.
[4] *See* Congressional Research Service, *Worker Participation in Employer-Sponsored Pensions: Data in Brief*, at 4 (Dec. 1, 2020), https://fas.org/sgp/crs/misc/R43439.pdf.
[5] *See id.*

market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to closely monitor the plan to ensure that every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

4.    To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quotation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.    Contrary to these fiduciary duties, Defendants used the Plan to promote MetLife's proprietary financial products and earn profits for MetLife. Throughout the relevant period, Defendants selected and retained seven proprietary index funds for the Plan's investment menu: the Met Life Bond Index Fund, Balanced Index Fund, Large Cap Equity Index Fund, Large Cap Value Index Fund, Large Cap Growth Index Fund, Mid Cap Equity Index Fund, and Small Cap Equity Index Fund (collectively, "MetLife Index Funds"). Each of these index funds tracks one or more benchmarks indices to provide exposure to certain asset classes or segments of the market. These are the only index funds offered to Plan participants.

6.    Plaintiffs do not challenge either the decision to use passive investments for these asset classes or the index used to represent each asset class. Defendants' fiduciary breaches relate to *which* index funds they used to track each of these indices, a determination that fell squarely within the scope of their fiduciary duties. Defendants' retention of the MetLife Index Funds in the Plan reflects a failure to prudently and objectively evaluate index fund options for the Plan.

7.      The marketplace for index funds is highly competitive. For most major market indices, one or more companies offer an index fund product that can track the index with a high degree of accuracy, while charging very low fees. This is particularly true for large investors such as the Plan (which at all relevant times had over two billion dollars invested in index fund investments), which can leverage their billions in investable assets to negotiate lower fees than what is available to the vast majority of investors.

8.      A prudent and objective review of comparable investments in the marketplace would have revealed numerous available investments that were less costly and superior to the MetLife Index Funds that Defendants selected and retained in the Plan. But instead of investing in any of these competitive index fund offerings in the marketplace, Defendants choose to generate profits for MetLife by investing exclusively in the MetLife Index Funds, which charged fees that were *up to six times higher* than marketplace alternatives that tracked the exact same index.

9.      Defendants' imprudent and disloyal retention of the MetLife Index Funds in the Plan has resulted in of millions of dollars in excessive fees and lost investment returns to the Plan and its participants since the start of the statutory period in 2015.

10.     Based on the actions and omissions of Defendants, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), and against MetLife Group and Metropolitan Life for failure to monitor fiduciaries (Count Two). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches and other appropriate relief.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which permit participants in an employee retirement plan to pursue a civil action on behalf of the plan to remedy

4

breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

12.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

13.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants reside and may be found.

## THE PARTIES

### PLAINTIFF

14.     Plaintiff Rita Kohari resides in Nashua, New Hampshire. She was a participant in the Plan from approximately 2010 until 2020. Plaintiff Kohari was invested in the MetLife Bond Index Fund, Balanced Index Fund, and Large Cap Growth Index Fund during the statutory period. As a result, she has been financially injured by the unlawful conduct described herein. Plaintiff Kohari's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

15.     Plaintiff John Radolec resides in North Ridgeville, Ohio. He has participated in the Plan since 1977 and is a current participant. Plaintiff Radolec has been invested in the MetLife Balanced Index Fund, Large Cap Equity Index Fund, and Large Cap Value Index Fund during the statutory period. As a result, he has been financially injured by the unlawful conduct described herein. Plaintiff Radolec's account would be worth more today had Defendants not violated ERISA as described herein.

16.     Plaintiff Mohani Jaikaran resides in Brooklyn, New York. She was a participant in the Plan from approximately 1986 until 2018. Plaintiff Jaikaran was invested in the Met Life Bond Index Fund, Balanced Index Fund, Large Cap Equity Index Fund, Large Cap Value Index Fund,

Large Cap Growth Index Fund, Mid Cap Equity Index Fund, and Small Cap Equity Index Fund during the statutory period. As a result, she has been financially injured by the unlawful conduct described herein. Plaintiff Jaikaran's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

### THE PLAN

17.     The Plan was established on May 1, 1970. The Plan was previously called the Savings and Investment Plan for Employees of Metropolitan Life and Participating Affiliates, but was renamed the MetLife 401(k) Plan in 2017. The Plan was sponsored by Metropolitan Life Insurance Company until September 2018, when MetLife Group became the plan sponsor.

18.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

19.     The Plan covers eligible employees of Metropolitan Life, MetLife Group, Metropolitan Property and Casualty Insurance Company, MetLife Funding, Inc., MetLife Credit Corp., and SafeGuard Health Plans, Inc. Eligible employees saving for retirement may contribute a percentage of their earnings on a pre-tax basis to the Plan.

20.     Throughout the relevant period, the Plan had between 36,000 and 42,000 participants and approximately $6.4 billion to 7.3 billion in assets. As of 2019, the Plan was the 111th largest defined contribution plan in the country out of a total of 718,632 defined contribution plans. This means the Plan is within the largest 0.015% of defined contribution plans nationwide. Plans of this size are often described as "mega" or "jumbo" plans.

21.     The Plan's investment menu consists of nine investment options[6] and a self-directed brokerage account. Eight of the nine investment options are MetLife proprietary investments,[7] including all seven of the at-issue index funds.[8] Throughout the statutory period, Defendants never changed the Plan's investment menu.

DEFENDANTS

*MetLife Group, Inc.*

22.     Defendant MetLife Group is a New York corporation and a subsidiary of MetLife, Inc.

23.     MetLife Group is the current "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because MetLife Group exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

24.     MetLife Group is also specifically identified as the Administrator of the Plan in the Plan's Form 5500s filed with the United States Department of Labor. MetLife Group's status as Plan Administrator also renders it a fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

25.     To the extent that MetLife Group has delegated any of its fiduciary functions to others, such as the Committee, it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes

---

[6] The Plan documents refer to these investments as the "Core Funds."

[7] MetLife Investment Departments is the investment manager for all of the MetLife Index Funds.

[8] Plaintiffs do not assert any claims against Defendants regarding management of the International Equity Fund or the Fixed Income Fund.

discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D- 4); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("[T]he power … to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)."). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 691 (D. Conn. 2018) ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power") (quotation omitted).

### *Metropolitan Life Insurance Company*

26.     Defendant Metropolitan Life is one of the largest global providers of insurance, annuities, and employee benefits. It is domiciled in New York.

27.     Metropolitan Life was the plan sponsor from at least 2014 until 2017. During that time, it had ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because Metropolitan Life exercised discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it was a functional fiduciary under 29 U.S.C. § 1002(21)(A).

28.     Until 2017, Metropolitan Life was also specifically identified as the Administrator of the Plan in the Plan's Form 5500s filed with the United States Department of Labor. Metropolitan Life's status as Plan Administrator also rendered it a fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

29.     To the extent that Metropolitan Life delegated any of its fiduciary functions to others, such as the Committee, it maintained fiduciary responsibilities with respect to the Plan.

**The Benefit Plans Investment Advisory Committee**

30.     The Benefit Plans Investment Advisory Committee is a committee that assists MetLife Group with administration of the Plan. According to Plan documents, the Benefit Plans Investment Advisory Committee selects the funds for the Plan's investment menu. In performance of its duties, the Committee exercises "authority or control respecting management or disposition of the Plan's assets" and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

31.     Defendants John and Jane Does 1-20 ("Doe Defendants") are or were members of the Committee during the statutory period. Each of the Doe Defendants are also fiduciaries under 29 U.S.C. § 1002(21)(A). The identities of the Doe Defendants are not currently known to Plaintiffs.

32.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## LEGAL AND FACTUAL BACKGROUND

### ERISA FIDUCIARY DUTIES

33.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of

       (i)      providing benefits to participants and their beneficiaries; and

       (ii)     defraying reasonable expenses of administering the plan;

    (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

34.    These ERISA fiduciary duties are "the highest known to the law." *LaScala*, 479 F.3d at 219 (quotation omitted). "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 339 (3d Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 2565 (2020).

**DUTY OF LOYALTY**

35.    The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *Vellali*, 308 F. Supp. 3d at 691 (quoting *Donovan v. Bierwith*, 680 F.2d 263, 271 (2d Cir. 1982)). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

"Breaches of the unwavering duty of loyalty occur when a fiduciary deviates from that single-minded devotion, placing its interests … above that of plan participants or beneficiaries." *Vellali*, 308 F. Supp. 3d at 688 (quotation omitted).

### DUTY OF PRUDENCE

36.      ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). This includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); *see also Vellali*, 308 F. Supp. 3d at 683 ("Fiduciaries have a continuing duty of some kind to monitor investments and remove imprudent ones.") (quotation omitted). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Tibble*, 135 S. Ct. at 1828 (quotation omitted). This necessarily entails consideration of investment costs. *See Sweda*, 923 F.3d at 328-29 ("Fiduciaries must … consider a plan's power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.") (quotation omitted).

### MARKETPLACE FOR INDEX FUNDS IN RETIREMENT PLANS

37.      An index fund is a passively managed, pooled-investment product designed to mirror the performance of a particular benchmark index.[9] For example, S&P 500 index funds aim to track the Standard & Poor's 500 Index, a market capitalization-weighted index of the 500 largest publicly traded companies in the United States.

---

[9] *See Investor Bulletin: Index Funds*, United States Securities and Exchange Commission (Aug. 6, 2016), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-26?utm_source=google&utm_campaign=2021_nonbrand_campaign&utm_medium=search.

38.     The marketplace for index funds has evolved such that for any given asset class, there are generally dozens of different products available that track a benchmark index which tracks that particular asset class. These products are not limited to the best-known index associated with the asset class. For example, not only are there numerous products that track the S&P 500, but there are also numerous products that track the Russell 1000, another index that tracks large-cap domestic stocks. Regardless of the benchmark index that an investor wishes to track, there will generally be several products in the marketplace from which to choose.

39.     The marketplace for index funds is highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision, while charging very low fees. These companies—which include BlackRock, Northern Trust, State Street, Vanguard, and Fidelity—have distinguished themselves in the marketplace based on several competitive advantages: lower investment management fees than competing firms, a high degree of institutional expertise, sophisticated trading platforms that minimize trading costs, and a large asset base that provides economies of scale. As a result, they have captured a very large percentage of market share of passively managed assets among large retirement plans such as the Plan.

40.     In contrast, less competitive firms sometimes charge fees that are five or more times higher than the fees charged by leading companies for managing an index fund that tracks the exact same index. A higher level of fees does not in any way correspond to a higher quality product or higher level of services. To the contrary, the least expensive offerings often have the lowest level of tracking error, meaning that they track the index with the highest level of precision.[10]

---

[10] *See* Ari I. Weinberg, *Watch an Index Fund's 'Tracking Error'*, Wall Street Journal (July 9, 2012), https://www.wsj.com/articles/SB10001424052702303734204577466453629079534 (finding that "[f]or many index funds . . . tracking error essentially will be equivalent to the fund's expense ratio.").

41.     Given the competitiveness of the index fund marketplace, and the evolution of available products and the level of fees, prudent managers of large investment portfolios that include index fund holdings will closely monitor the cost and performance of the index funds in their portfolio, while regularly comparing that cost and performance to the fund's closest competitors, making changes when warranted based on the fees, tracking error, and institutional quality of available products.

## DEFENDANTS' VIOLATIONS OF ERISA

**I.     DEFENDANTS SELECTED AND RETAINED HIGH COST, POORLY PERFORMING PROPRIETARY INDEX FUNDS TO THE DETRIMENT OF PLAN PARTICIPANTS.**

42.     Although using proprietary options is not a per se breach of the duty of prudence or loyalty, a fiduciary's process for selecting and monitoring proprietary investments is subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments. Based on Defendants' retention of proprietary index funds in lieu of less expensive and otherwise superior nonproprietary index fund alternatives, it is reasonable to infer that Defendants' process for selecting and monitoring the MetLife Index Funds was imprudent and tainted by self-interest.

43.     Each of the MetLife Index Funds charge an annual operating expense that is paid to MetLife and deducted from the rate of return of the fund. In addition to receiving these investment management fees, and because the MetLife Index Funds are structured as separate accounts, MetLife also claims a tax deduction called the Dividend Received Deduction ("DRD") on dividends received on the assets owned by MetLife on behalf of the Plan. *See* 26 U.S.C. § 243. For insurance companies with large separate accounts such as MetLife, this DRD tax benefit can be worth millions of dollars. If Defendants had not invested the Plan's assets in the MetLife Index

Funds, MetLife would have received significantly less money from investment management fees and the DRD tax benefit.

44.     As discussed above, the marketplace for index funds is highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision, while charging very low fees. There were numerous investment managers in the marketplace, including BlackRock, Northern Trust, State Street, Vanguard, and Fidelity, that throughout the relevant period offered products tracking the same benchmark indices as each of the MetLife Index Funds with a high degree of precision, while charging very low fees. With more than $2 billion in index fund assets at all times during the relevant period, Defendants could have negotiated competitive rates with these leading index fund managers in line with other plans of similar size.

45.     As shown by the charts below, the MetLife Index Funds are considerably more expensive—indeed ***several times more expensive***—than otherwise identical alternatives being used in other large Plans.[11]

| Fund (Ticker) | Expense Ratio[12] | Relative % Fee of Plan Index Fund | Plan Examples |
|---|---|---|---|
| **S&P 500 Index** | | | |
| **MetLife Large Cap Equity Index Fund** | **5.9 basis points** | **n/a** | |
| BlackRock Equity Index Fund (CIT) | 1.0 bps | 590% | Home Depot, Citibank, |
| State Street S&P 500 Index Non-Lending Fund (CIT) | 1.3 bps | 454% | Target, PNC Bank, The Hartford |
| Vanguard Institutional Index Trust (CIT) | 1.2 bps | 492% | US Bank, Koch |
| **Bloomberg Barclays U.S. Aggregate Bond Index** | | | |

[11] The fees charged by certain collective investment trusts ("CITs"), including those in the chart below, are negotiable. The expense ratios shown below represent the total investment fees paid by the listed plans.

[12] Excludes additional fees added on to pay expenses associated with the administration of the plan. Pursuant to the Plan's 5500s for 2018 and 2019, 100% of the fee amounts shown were "investment management fees" paid to MetLife.

| Fund (Ticker) | Expense Ratio[12] | Relative % Fee of Plan Index Fund | Plan Examples |
|---|---|---|---|
| **MetLife Bond Index Fund** | **7.8 bps** | **n/a** | |
| BlackRock U.S. Debt Index NL Fund (CIT) | 2.0 bps | 390% | Aon, Citibank |
| Northern Trust Aggregate Bond Index NL Fund (CIT) | 2.0 bps | 390% | Caterpillar, RR Donnelley |
| State Street U.S. Bond Index NL Fund (CIT) | 2.0 bps | 390% | State of Michigan 401(k) Plan |
| **Russell 1000 Growth Index** | | | |
| **MetLife Large Cap Growth Index Fund** | **6.9 bps** | **n/a** | |
| BlackRock Russell 1000 Growth Index (CIT) | 2.0 bps | 345% | Oregon Savings Growth Plan |
| Northern Trust Russell 1000 Growth – Non-Lending (CIT) | 2.0 bps | 45% | Massachusetts SMART Plan |
| **Russell 1000 Value Index** | | | |
| **MetLife Large Cap Value Index Fund** | **9.2 bps** | **n/a** | |
| BlackRock Russell 1000 Value Index (CIT) | 2.0 bps | 460% | Oregon Savings Growth Plan |
| Northern Trust Russell 1000 Value – Non-Lending (CIT) | 2.0 bps | 460% | Massachusetts SMART Plan |
| **S&P 400 Index** | | | |
| **MetLife Mid Cap Equity Index Fund** | **6.1 bps** | **n/a** | |
| BlackRock Mid-Cap Equity Index NL Fund (CIT) | 1.2 bps | 508% | Citibank |
| Northern Trust S&P MidCap 400 Index – Non-Lending (CIT) | 2.0 bps | 305% | Sony USA |
| State Street S&P MidCap Index NL Fund (CIT) | 2.0 bps | 305% | State of Michigan 401(k) |
| **Russell 2000 Index** | | | |
| **MetLife Small Cap Equity Index Fund** | **7.8 bps** | **n/a** | |
| BlackRock Russell 2000 Index Fund (CIT) | 1.2 bps | 650% | Citibank |
| State Street Russell Small Cap Index NL Fund (CIT) | 2.5 bps | 312% | Massachusetts SMART Plan |
| **Fidelity** Small Cap Index (FSSNX) | 2.5 bps | 312% | Nucor |
| **Blended Return of S&P 500 Index & Bloomberg Barclays U.S. Aggregate Bond Index** | | | |
| **MetLife Balanced Index Fund** | **8.5 bps** | **n/a** | |
| Custom Blend[13] | 1.5 bps | 567% | Home Depot |

---

[13] Because the Balanced Index Fund offered by MetLife consists of two indices—a 50% allocation to the S&P 500 and a 50% allocation to the Bloomberg Barclays Aggregate Bond Index, rebalanced monthly—a plan (such as MetLife) that offers index funds tracking each of those indices can create a balanced index fund option by simply allocating the fund's assets to the two

46.    Defendants failed to adequately investigate these marketplace alternatives in selecting and retaining index funds for the Plan, choosing instead to further MetLife's interests by using the MetLife Index Funds. Defendants chose these proprietary funds even though they charged fees that were significantly higher than the fees charged by more competitive options that were identical (other than their lower cost). Had Defendants been monitoring the expenses of these index funds and performed a reasonable investigation of marketplace alternatives consistent with the practice of other fiduciaries of 401(k) plans, they would have replaced the MetLife Index Funds with one of the more competitive alternatives in the marketplace, such as those listed above, all of which were available to Defendants.

47.    The use of the MetLife Index Funds has resulted in significant losses for participants, as each index fund underperformed the alternatives listed above by roughly the difference in costs. For example, the below chart shows the net-of-fee performance of the MetLife Large Cap Equity Index Fund and three comparators relative to the S&P 500 Index for the 5-year period ending in 2019:

| Fund (Ticker) | Expense Ratio[14] | Annual Performance vs S&P 500 (+/-) |
| --- | --- | --- |
| **S&P 500 Index** | | |
| **MetLife Large Cap Equity Index Fund** | **5.9 basis pts** | **- 7 bps** |
| BlackRock Equity Index Fund (CIT) | 1.0 bps | - 1 bps |

underlying index funds and rebalancing to the target mix at the end of each month. The Home Depot Future Builder Plan created such a custom blend in order to offer participants a balanced index fund option that tracked the same indices as the MetLife Balanced Index Fund, with average annual fees of 0.012%. The fees shown in the chart are adjusted upward to reflect the fact that Home Depot's custom balanced index fund allocated 60% of balanced index assets to the S&P 500 index fund, the less expensive of the two funds.

[14] Excludes additional fees added on to pay expenses associated with the administration of the plan. Pursuant to the Plan's 5500s, 100% of the fee amounts associated with the MetLife index funds shown above were "investment management fees" paid to MetLife.

| Fund (Ticker) | Expense Ratio[14] | Annual Performance vs S&P 500 (+/-) |
|---|---|---|
| State Street S&P 500 Index Non-Lending Fund (CIT) | 1.3 bps | - 2 bps |
| Vanguard Institutional Index Trust (CIT) | 1.2 bps | 0 bps |

48.     Not only were the MetLife Index Funds more expensive, but they were also of lower quality than other options when it came to their sole function—tracking the underlying index. For the 5-year period ending in 2019, two of the seven index funds performed as expected, meaning equal to the benchmark minus expenses, five index funds performed worse than expected, and no index funds performed better than expected. For the MetLife Small Cap Equity Index Fund, this underperformance has been egregious: it has underperformed its benchmark index by an average of 34 bps per year over the ten years ending in 2019.

49.     Institutional factors, such as assets under management, also demonstrate the superiority of passive managers other than MetLife. Vanguard, State Street, Northern Trust, Fidelity, and BlackRock each manages over $300 billion in indexed assets (with BlackRock, State Street, and Vanguard managing over $1 trillion in passive investments).[15] By comparison, MetLife manages under $35 billion in indexed assets.[16]

50.     A prudent fiduciary managing the Plan through a process that was not tainted by self-interest would have removed the MetLife Index Funds from the Plan. By retaining the MetLife Index Funds to further the financial interests of MetLife and failing to investigate the availability

---

[15] Hewitt Index Fund Report at 2-5; Mercer Index Fund Report at 10, 25; BlackRock Index Fund Report at 27, 45; Fidelity Investments, *Fidelity Continues to Deliver Industry-Leading Value with Launch of New Index Funds* at 1 (July 16, 2019) https://s2.q4cdn.com/997146844/files/doc_news/archive/a959f7c6-eb08-4644-a43d-69f3cfa7053a.pdf.

[16] MetLife Investment Management, *Index Strategies*, https://investments.metlife.com/investment-strategies/index-strategies/ (last visited July 13, 2021).

of superior, lower-cost alternatives in the marketplace, Defendants have breached their fiduciary duties of loyalty and prudence.

## II.   PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

51.   Plaintiffs did not have knowledge of all material facts (including, among other things, the investment options and menu choices of fiduciaries of similar plans, the costs of the Plan's investments compared to those in similarly sized plans, and the availability of superior investment options) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

52.   Plaintiffs seek certification of this action as a class action pursuant Federal Rule of Civil Procedure 23 and ERISA's derivative action provisions, 29 U.S.C. § 1109 and 1132(a)(2).

53.   Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[17]

> All participants and beneficiaries of the MetLife 401(k) Plan who were invested in MetLife Index Funds at any time on or after July 19, 2015, excluding any persons with responsibility for the Plan's investment or administrative functions.

---

[17] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

54.     <u>Numerosity</u>:    The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 36,000 to 42,000 participants at all relevant times during the applicable period, many of whom were invested in the MetLife Index Funds.

55.     <u>Typicality</u>:     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered financial harm as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

56.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

57.     <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.   Whether Defendants are fiduciaries with respect to the Plan;

b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

c.   Whether MetLife Group and Metropolitan Life breached their duty monitor other Plan fiduciaries;

d.   The proper form of equitable and injunctive relief; and

e.   The proper measure of monetary relief.

58.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

59.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

60.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will remove the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial

efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

61.     As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

62.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with their administration of the Plan and the selection and monitoring of Plan investments.

63.     Defendants breached these fiduciary duties by engaging in the conduct described herein. Among other things, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the MetLife Index Funds, and gave an improper and unjustified preference to these funds over superior, less expensive alternative available options.

64.     Instead of acting in the best interest of Plan participants, Defendants' conduct and decisions were driven by a desire to drive revenues and profits to MetLife and its subsidiaries, and to generally promote MetLife's business interests. Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

65.     Further, each of the actions and omissions described in paragraphs 63-64 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

66.     As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses throughout the statutory period.

67.     Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, and to restore to the Plan any profits (including any DRD benefit) Defendants captured through the use of Plan assets or which resulted from such fiduciary breaches. In addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## <u>COUNT II</u>
### Failure to Monitor Fiduciaries (against MetLife Group and Metropolitan Life)

68.     As alleged throughout the Complaint, MetLife Group is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A). Because it has overall oversight responsibility for the Plan and the specific responsibility to appoint and remove members of the Committee, MetLife Group has a fiduciary responsibility to monitor the performance of the Committee and its members and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Coyne*, 98 F.3d at 1465; *Vellali*, 308 F. Supp. 3d at 691

69.     Similarly, while it was the plan sponsor and plan administrator, Metropolitan Life was a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A). While it was a fiduciary, Metropolitan Life had a responsibility to monitor the performance of the Committee and its members and to ensure that they were complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Coyne*, 98 F.3d at 1465; *Vellali*, 308 F. Supp. 3d at 691.

70.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

71.     MetLife Group and Metropolitan Life breached their fiduciary monitoring duties by, among other things:

     a.  Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions with respect to the Plan;

     b.  Failing to monitor the Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

     c.  Failing to remove members of the Committee whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing index fund investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

72.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive fees and investment underperformance.

73.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), MetLife Group and Metropolitan Life are liable to restore to the Plan all losses suffered as a result of their failure to properly monitor the Committee, and to restore to the Plan any profits (including any DRD benefit) that they captured through the use of Plan assets or which resulted from their failure to properly

monitor the Committee. In addition, MetLife Group and Metropolitan Life are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Kohari, Radolec, and Jaikaran as a representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants breached their fiduciary duties under ERISA;

D.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.    An accounting for profits earned by MetLife, and a subsequent order requiring MetLife to disgorge all profits received from, or in respect of, the Plan;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to MetLife as a result of Defendants' unlawful conduct in violation of ERISA, or a surcharge against MetLife to prevent unjust enrichment from unlawful conduct involving the Plan;

G.    An order enjoining Defendants from any further violations of ERISA;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

I.    An award of pre-judgment interest;

J.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

K.    An award of such other and further relief as the Court deems equitable and just.

Dated: July 19, 2021                    **NICHOLS KASTER, PLLP**

By: s/ Paul J. Lukas
Paul J. Lukas, NY Bar Code PL1237
Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
Grace I. Chanin, MN Bar No. 0399969*
* *pro hac vice applications forthcoming*
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
gchanin@nka.com